**John M. DENKLER, et al., Appellants,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 85–2306.**

United States Court of Appeals, Federal Circuit.

Jan. 28, 1986.

---

Earl J. Silbert, of Washington, D.C., argued for appellants. With him on the brief

was Charles B. Wayne, Schwalb, Donnenfeld, Bray & Silbert, of Washington, D.C., of counsel.

Robert G. Giertz, Senior Trial Counsel, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., and David M. Cohen, Director.

Before ·FRIEDMAN, Circuit Judge, NICHOLS, Senior Circuit Judge, and BISSELL, Circuit Judge.

NICHOLS, Senior Circuit Judge.

This appeal is from a Claims Court decision on cross-motions for summary judgment. The four claimants were regular officers of the Army and Navy, retired for length of service and not for disability who, after such retirement, had taken staff positions with the Board of Governors of the Federal Reserve System. The appellee United States, with the support of the General Accounting Office (B–212226, Dec. 16, 1983), had determined that as a matter of law the Dual Compensation Act, 5 U.S.C. § 5531 and ff. as reenacted in 1964, required that the annuities otherwise due these officers must be reduced according to the statutory formula on account of their civilian employment. Recapture of past payments in excess of the formula ensued, and future payments were denied. The named appellant Denkler has, since February 1983, been employed by the Federal Reserve Bank at Richmond, Virginia, but no attempt has been made to apply the Dual Compensation Act to his pay for such employment. This lawsuit followed, but the Claims Court (Harkins, J.), in a thoughtful but unreported opinion, ordered it dismissed. We reverse.

*Discussion*

There is but one issue in this case: the legal one whether the Dual Compensation Act, as modified and reenacted in 1964, covers staff jobs with the Board of Governors of the Federal Reserve System (board), as it does more ordinary jobs in the

executive, legislative, and judicial branches, and operates to curtail the annuities of retired regular officers so employed. It is a close and difficult issue. We have studied carefully and greatly respect the decisions contrary to our views which the Comptroller General and the Claims Court have made.

### I

The board is at the apex of a pyramid of federal financial instrumentalities constituting, at the base, the national banks and state banks electing to join the system, the Federal Reserve banks, in which member banks in the system own the stock, and overall, setting policies and prescribing monetary measures, the board. Title 12 of the United States Code establishes the legal powers and structure of this group in general, as well as the Federal Deposit Insurance Corporation and the Comptroller of Currency. The board itself is created in 12 U.S.C. § 241. By section 243 the board levies upon the Federal Reserve banks assessments sufficient to pay, among other things, salaries of members and employees, so that no appropriation need be or is requested for these purposes. Section 244 declares that "funds derived from such assessments shall not be construed to be Government funds or appropriated moneys." By section 248, the bank may employ attorneys, experts, and other employees at salaries to be fixed, the appointments to be made without regard to Chapter 12 of Title 5, but the President is not prevented from placing such employees in the classified service. A search of the statute reveals no authorization of appropriations, such as is usually found in the statutory charters of governmental entities which may rely on such appropriations in whole or in any part.

The Court of Claims defined a nonappropriated fund agency as one where there has been a "clear expression by Congress that the agency was to be separated from general federal revenues," *Norris Industries Inc. v. United States*, 231 Ct.Cl. 10, 681 F.2d 751, 752 (1982), and cases cited at

752. We think such a "clear expression" is made in the legislation here, at least with respect to the board's needs for money to pay salaries to its staff. The combination of designation of assessments on banks as the source of funds for salaries, and the absence of the conventional language authorizing funds to be appropriated, even when other sources are also looked to, accomplishes such clear expression.

Since *Standard Oil Co. v. Johnson*, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942), it has been well understood that a nonappropriated fund activity (in that case an Army exchange), can be an instrumentality of the United States. However, mere status as an instrumentality does not provide a solution here since national banks and Federal Reserve banks are also instrumentalities of the United States yet outside the Dual Compensation Act. *Gradall v. United States*, 161 Ct.Cl. 714, 329 F.2d 960, 964 (1963). Actually, the United States does not contend that the Dual Compensation Act applies to reduce the annuity of appellant Denkler during his time of service at a Federal Reserve bank.

### II

■ Whether or not the limitations on "dual compensation" of retired regular officers in 5 U.S.C. § 5532 limits their right to annuities if employed by the board here involved, depends on the definition of "position" in section 5531(2). So far as pertinent, it reads as passed in 1964:

(2) "position" means a civilian office or position * * * in the legislative, executive, or judicial branch of the Government of the United States (including a Government corporation and a nonappropriated fund instrumentality under the jurisdiction of the armed forces) or in the government of the District of Columbia.

Act of Aug. 19, 1964, Pub.L. No. 88–448, 1964 U.S.Code Cong. & Ad.News (78 Stat. 484) 556.

This language, except for the parenthetical clause, virtually paraphrases the previous Dual Compensation Act (Act of June 30, 1932, 47 Stat. 406) in this definition. That

definition was held in *Gradall, supra,* not to cover retired officers who worked for nonappropriated fund activities. The parties, having researched the legislative history of the 1964 Act, have derived a supposed message that the "policy" of the new Act was that "the taxpayer" should not pay the same individual two salaries. Admitting that in fact the salaries are paid by the assessed Federal Reserve banks, much ingenuity is devoted to answering whether the salaries indirectly diminish appropriated funds, or reduce the general fund of the Treasury. We pass over all this. Whatever weight the plight of the 1964 federal taxpayer had in the congressional mind, the definition is so absurdly over and under inclusive as to burdening the taxpayer with instances of "double dipping," that *no* guide to interpretation can be derived from the supposed policy. It is over inclusive so far as applied to nonappropriated fund activities, a substantial extent at the least. It is under inclusive in that no reduction in annuity occurs if a retired officer works in an activity, *e.g.,* in a university, which is not a federal instrumentality but is funded by government contract or grant as to the officer's pay. Congress cannot but have been aware of the extent, a large one, to which personal services are funded by the taxpayer in activities outside any reading of the definition.

The legislative history published by Congress, S.Rep. No. 935, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad. News 2834, imparts the significant point that the prior law was regarded as unduly harsh on retired regular officers, whose government employment was effectively prohibited, and also harsh on government agencies that might need their services. The new provisions were intended to allow enough dual compensation to be retained without penalty to remove the total disincentive to government reemployment, though obviously, yet unmentioned, some incentive to the retired officer to prefer private employment remained. The new law was nevertheless meant for relief of retired regular officers and was not regarded as penal.

It seems apparent that the real congressional motives were mixed and with concern for the public fisc, broader and undefined notions about the fairness and propriety of "double dipping" also had their part. We do not mean by using this convenient catch phrase to give it the pejorative connotation it has in some minds. "Double dipping" is most resented when the retiree takes a position to which active duty civil servants also aspire.

Specifically, however, this legislative history affords no light on how to read the parenthetical clause respecting nonappropriated fund instrumentalities, which obviously lies at the heart of the question we must answer. It appears to have been a response to a letter by the Comptroller General, annexed to H.Rep. No. 890, 88th Cong. 1st Sess. 24 (1963). That officer, commenting on a prior committee bill, H.R. 12721, 87th Cong., 2d Sess. said:

The term "civilian office" as defined in section 101(c) neither expressly includes nor excludes positions under armed services post exchanges and other nonappropriated fund activities. However, we doubt that such positions may be regarded as "in the U.S. Government" within the meaning of the definition. In the absence of a clear expression of legislative intent to the contrary, we would not construe the bill as applying to employees of such activities.

It looks as if new language was placed there to meet a concern that proper clarity in legislative drafting required some mention of nonappropriated fund instrumentalities, rather than to deal with the other concerns that had led a busy Congress to reopen the dual compensation issues.

### III

In 1952 the Congress, at the request of the Department of Defense, took up the question, resulting from the unexpected Supreme Court decision in *Standard Oil Co. v. Johnson, supra,* whether employees of certain military nonappropriated fund activities, which were named, might claim status as government employees for the

purpose of the federal civil service and employee's compensation laws. The military agencies had determined tentatively that they were not, and obtained ratification of that view in the Act of June 19, 1952, Pub.L. No. 397, (then codified as 5 U.S.C. § 150k, now 5 U.S.C. § 2105(c) (1982). The history in H.Rep. No. 1995, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad.News 1520, shows that Congress legislated and meant to legislate only with respect to the Department of Defense agencies, the only ones whose existence was called to its attention by the requesting government agency, that same Department of Defense.

■ We may take judicial notice, however, that there existed then, and exist now, activities throughout the government that were and are clearly or arguably nonappropriated fund instrumentalities. This fact was brought forcibly to congressional attention in 1969–70. The Court of Claims, in a series of decisions culminating in *Kyer v. United States*, 177 Ct.Cl. 747, 369 F.2d 714 (1966), *cert. denied*, 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967), had decided that the Tucker Act waiver of sovereign immunity and consent to suit, 28 U.S.C. § 1491, applied only to claims arising out of appropriated fund activities, and therefore not to obligations arising out of the kind of nonappropriated fund activities such as those specified in the parenthetical clause of the Dual Compensation Act, and in the present 5 U.S.C. § 2105(c). This was regarded in Congress as a great injustice and a bill, S. 980, 91st Cong., 2d Sess. (1970), was proposed that would have applied to all nonappropriated fund activities. There ensued a blizzard of protests from government agencies. Representative is a letter from the Secretary of Agriculture calling attention to the existence of activities in his department respecting marketing of products, etc., which quite arguably would be covered. H.Rep. No. 933, 91st Cong., 2d Sess. 6–7, *reprinted in* 1970 U.S.Code Cong. & Ad.News 3477, 3482. As a result, S. 980 was amended to apply only to contracts of certain Department of Defense and Coast Guard nonappropriated fund activities specifically named in the amendment. H.Rep. No. 933, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 3477. It passed in this form, Pub.L. No. 91–350, and the consent in the present 28 U.S.C. § 1491 still specifies only certain named activities, the Exchange Councils of NASA being added, however. None of the various specific congressional designations go beyond the general area of activities to use nonappropriated funds to further the welfare of employees and provide them recreation.

### IV

■ The view of the appellee and of the court below is that section 5531, in specifically designating only the nonappropriated fund instrumentalities of the military departments, was being illustrative rather than selective; that the omission of activities not under the Department of Defense was meaningless. In view of the foregoing, we think such a view cannot be sustained.

The trial judge seems to have thought the limitation of the parenthetical clause to Armed Forces nonappropriated fund activities only was an absurd result. He quotes a Court of Claims decision, historic in its day, *Otoe and Missouri Tribe of Indians v. United States*, 131 Ct.Cl. 593, 602, 131 F.Supp. 265, *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955), to the effect that "[t]he application of any particular rule [of statutory construction] may well be affected by other rules in order to avoid absurd results." We have, however, in more recent litigation, had to conclude that the absurd result, as it appears to the judge, of literal construction of a statute, does not justify a reading unsupported by the text, unless it can be shown that the intent of Congress was imperfectly expressed, a showing that can be made from legislative history or from the structure of the statutes taken as a whole. *Ambassador Division of Florsheim Shoe v. United States*, 748 F.2d 1560, 1564 (Fed.Cir.1984). Anything more is setting up the judge as

wiser than the legislator. However absurd it may perhaps be to confine this impact of the Dual Compensation Act on retired officers employed in nonappropriated fund agencies, to such agencies in the Department of Defense, we have shown that Congress has frequently so confined other laws to such agencies, with equal logic or illogic, and that it had good reason to avoid the venturing into the unknown that legislating respecting nonappropriated fund activities outside the Department of Defense would have been. We may add that attempts to draw a "bright line" almost anywhere, respecting dual compensation in government employment, is bound to produce apparently absurd results if cases just inside the line are compared with cases just over, yet dual compensation is an area of law where the "bright line" is necessary if it is anywhere.

Congress appreciated as early as 1952 that the nonappropriated fund activities presented a host of possible legal problems, but that they might be exacerbated rather than corrected if Congress legislated in language so sweeping as to cover activities it knew nothing about. It is true Congress meant to overrule *Gradall v. United States, supra,* as a precedent, but only in part, so far as that case held that the previous Dual Compensation law did *not* apply to an officer employed by one of the exchange services already considered by it in 1952. The case still stands as a binding precedent in this court respecting any nonappropriated fund activity not so designated and, except as modified by the parenthetical clause, is good law today. The language of section 5531 is easily and rationally explained if we suppose the draftsman looked at what was then 5 U.S.C. § 150k and concluded it was safe to track it, but risky to go beyond. He may have supposed, erroneously, that the Department of Defense nonappropriated fund activities were the only ones that were significant. Whether he supposed this or not, in any case he deemed it safer to stick to the nonappropriated fund agencies Congress knew about, could name, and as to which it had already legislated, though in different contexts. It would be a mere act of judicial lawmaking to take the parenthetical clause, which is for good reason expressly limited to a special category of nonappropriated fund activities, and make it general. Should Congress wish to extend the Dual Compensation Act to retired regular officers employed by the board, it knows how to do so. Judging by its previous care in this area, it would not do so without an informed and reasoned understanding of the consequences whatever it legislated would have, an understanding unavailable to us in the judicial branch. We are asked to legislate in the dark. The decision below is also inimical to the need of a retired regular officer to look at the statute and come to a reasonably certain conclusion whether a proposed employment is subject to the Dual Compensation Act or not. The appellants complain of having received conflicting advice, which would not have occurred if the financial officers of the government had confined themselves to reading the statute and advising inquirers what it said.

### Conclusion

For the reasons stated in the foregoing discussion, the decision and judgment of the Claims Court denying appellants' motion for summary judgment and granting the appellee's motion, are both reversed, and the cause is remanded to the Claims Court with direction to enter judgment for the appellants and for determination of the damages due and owing the appellants, subject to the statute of limitations if it has run on any portion of their claims.

REVERSED AND REMANDED.

FRIEDMAN, Circuit Judge, dissenting.

I conclude that the Dual Compensation Act of 1964 applies to the Board of Governors of the Federal Reserve System (Board), and therefore I would affirm the judgment of the Claims Court.

The statutory definition of "position," which controls the applicability of the Act to the appellants, is broad. It covers "a

civilian office or position (including a temporary, part-time, or intermittent position), appointive or elective, in the legislative, executive, or judicial branch of the Government of the United States...." 5 U.S.C. § 5531(2) (1964). It contains no exceptions. The framing of the coverage of the Act in terms of all positions, of whatever duration, in all three branches of the government, indicates that the Act was intended to and does have precisely that sweeping scope. Indeed, it would be difficult to draft a broader definition.

Although the legislative history of the Act does not directly deal with the problem before us, it shows that Congress intended the statutory prohibition upon the receipt of dual compensation to have the broadest possible reach. The Senate Committee Report on the 1964 amendment stated that the Act was intended to cover "any civilian office or position in the Government of the United States." S.Rep. No. 935, 88th Cong., 2d Sess. 4, *reprinted in* 1964 U.S. Code Cong. & Ad.News 2835, 2837. In *Puglisi v. United States*, 215 Ct.Cl. 86, 564 F.2d 403 (1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59, *reh'g denied*, 436 U.S. 951, 98 S.Ct. 2860, 56 L.Ed.2d 794 (1978), involving a different issue under the Act, the court stated that "[o]ne obvious purpose of the 1964 dual compensation law, as it was of the predecessor statutes, is in general to put a ceiling on the amount of compensation certain classes of individuals can receive from the federal government." *Id.* at 409.

The positions with the Board, which plays a key role in the government's regulation of the nation's money and banking system, come within the literal language of the Act.

I do not read the parenthetical phrase in the definition "(including a Government corporation or non-appropriated fund instrumentality under the jurisdiction of the Armed Forces)" as exempting other nonappropriated fund instrumentalities from the broad reach of the definition. I think the reference to the military instrumentalities was to make explicit that the Congress was

overruling two decisions of the Court of Claims holding that a predecessor statute did not cover employment of retired military officers by military facilities financed from nonappropriated funds. *Gradall v. United States*, 161 Ct.Cl. 714, 329 F.2d 960 (1963) (positions with Army Exchange Service and Air Force Exchange Service); *Cockrill v. United States*, 161 Ct.Cl. 752 (1963) (manager of golf club).

Both cases involved section 212(a) of the Economy Act of 1932, 47 Stat. 406, which limited the amount of retired pay receivable from the United States by any person "holding a civilian office or position under the United States Government ...," and 5 U.S.C. § 150k (1952), which provided:

Civilian employees, compensated from nonappropriated funds, of the Army * * Exchange Service, * * * and other instrumentalities of the United States under the jurisdiction of the Armed Forces * * * shall not be held and considered as employees of the United States for the purpose of any laws administered by the Civil Service Commission or the provisions of the Federal Employees' Compensation Act....

The court held that because the purpose of the Economy Act was "to curtail expenditures from appropriated funds in Government employment," *Gradall*, 329 F.2d at 965, the "plaintiff's employment in the Army Exchange Service and the Air Force Exchange Service, a Federal nonappropriated fund instrumentality, did not constitute holding a civilian office or position under the United States Government within the meaning of the dual compensation provision, section 212(a) of the Economy Act of 1932." *Id.*

It reads too much into the congressional overruling of *Gradall* and *Cockrill* by making the Dual Compensation Act explicitly applicable to positions with a "nonappropriated fund instrumentality under the jurisdiction of the Armed Forces," to conclude that Congress thereby intended to exempt from the Act employment with other entities funded by nonappropriated funds. *Gradall* and *Cockrill* held only

that the 1932 Act did not cover employment with the military nonappropriated agencies there involved. There is no indication that Congress viewed those cases as announcing the general rule that the Dual Compensation Act did not cover all nonappropriated fund entities, or intended to subject to the Act only military facilities. Indeed, it is most unlikely that Congress intended to apply the bar of the Dual Compensation Act to employment with ancillary military instrumentalities of the kind involved in *Gradall* and *Cockrill* but to make it inapplicable to the Board, an agency that performs far more important and far-reaching governmental functions than those instrumentalities do.